**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| LISA GOODSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:25-cv-1208 |
| | ) |
| IQVIA HOLDINGS, INC., | ) *Jury Trial Demanded* |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**PLAINTIFF'S ORIGINAL COMPLAINT**

This action involves claims for religious discrimination under Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. 2000e-2 et seq.

## I.    INTRODUCTION

1.      Lisa Goodson ("**Plaintiff**" or "**Ms. Goodson**") applied for the position of Assistant Director of Patient Engagement Strategy, a fully remote role with IQVIA Holdings, Inc., ("**Defendant**" or "**IQVIA**") on March 7, 2023.

2.      Throughout March of 2023, Ms. Goodson spoke with IQVIA's Human Resources ("**HR**") personnel for preliminary interviews and was never informed the position required COVID-19 vaccination.

3.      Ms. Goodson met with several members of the IQVIA leadership team, as recommended to her by other employees at IQVIA, and during these discussions was told she was well qualified for the role she was applying for.

1

4.      On April 4, 2023, Ms. Goodson formally interviewed with Patrick Bosco ("**Mr. Bosco**"), the Head of Patient Engagement Strategy and hiring manager for the role that Ms. Goodson applied for.

5.      The interview went well, and Mr. Bosco followed up by email with Ms. Goodson to ask her to complete a sample project so that IQVIA could evaluate her work product.

6.      Immediately following the interview, Ms. Goodson, for the first time, noticed on the online job description that the position she applied for required COVID-19 vaccination.

7.      Ms. Goodson reached out to IQVIA's HR personnel and Mr. Bosco to inquire whether she would be required to receive a COVID-19 vaccination to be hired.

8.      She spoke with Shallu Magotra ("**Ms. Magotra**"), an IQVIA Talent Acquisition Manager, on April 4, 2023, and inquired about IQVIA's COVID-19 vaccination policy and religious and medical exemption process. Ms. Magotra informed Ms. Goodson that she had to speak with Mr. Bosco to confirm that COVID-19 vaccination was a requirement for the position that Ms. Goodson applied for.

9.      Ms. Goodson was advised by Mr. Bosco on April 6, 2023, that he was unsure of IQVIA's corporate policy on whether she had to be fully vaccinated for COVID-19 to work for IQVIA, but he saw no reason why the role would require her to be vaccinated because it was a remote position. He stated that he would follow up with HR on the corporate policy and advise her of the same.

10.     Ms. Goodson did not receive a response for approximately two weeks after these conversations. Consequently, she was forced to follow up on her own volition.

11.    On April 18, 2023, Mr. Bosco replied to Ms. Goodson and informed her that he was having a difficult time receiving concrete information on IQVIA's COVID-19 vaccination policy and whether it was a requirement for the remote position that Ms. Goodson interviewed for.

12.    Shortly thereafter, on April 19, 2023, Ms. Goodson received a voicemail from "Anita" (last name unknown), who was Ms. Magotra's assistant. Anita advised that Ms. Goodson's position required receipt of a COVID-19 vaccine. The assistant did not mention any religious or medical accommodation process for this condition of employment.

13.    Ms. Goodson was told to cease work on the sample project she was given because she was no longer being considered for the position because she was not fully vaccinated for COVID-19.

14.    On April 20, 2023, Ms. Goodson again emailed Ms. Magotra and Mr. Bosco and requested them to provide details on their COVID-19 religious and medical accommodation process and again advised that she would be seeking an exemption to the COVID-19 vaccination requirement, in accordance with federal law.

15.    On or about May 4, 2023, Ms. Magotra advised Ms. Goodson on a telephone call that Ms. Goodson would no longer be considered for the position because she was not fully vaccinated for COVID-19. Ms. Magotra would not apprise Ms. Goodson of any exemption or accommodation process, despite multiple attempts by Ms. Goodson to solicit information on how to apply for an exemption. Ms. Magotra advised that while it was not a corporate policy, in reckless disregard of applicable anti-discrimination laws, Mr. Bosco was requiring COVID-19 vaccination and was not permitting any exemptions for the role.

16.    Ms. Goodson was informed by Ms. Magotra that Mr. Bosco required her to be vaccinated for COVID-19 due to the unknown possibility in the future that she might need to

travel, despite the position being confirmed as fully remote and not requiring travel, according to Mr. Bosco.

17.    As a Christian, Ms. Goodson is a member of a protected class.

18.    Ms. Goodson is precluded from receipt of a COVID-19 vaccine due to her sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine, stemming from her Christian faith.

19.    In addition, Ms. Goodson notified IQVIA that her physician could provide proof of her need for a medical accommodation from the vaccination requirement.

20.    Ms. Goodson was qualified for the position that she applied for.

21.    IQVIA was an "employer" for purposes of Title VII.

22.    IQVIA rejected Ms. Goodson for the position she applied for because she advised IQVIA that she was requesting a religious and medical accommodation to their COVID-19 vaccination requirement.

23.    IQVIA never again reached out to provide Ms. Goodson any further information about an IQVIA exemption or accommodation policy that would enable Ms. Goodson to continue to be considered for the position.

24.    IQVIA ultimately filled the position with an applicant outside of Ms. Goodson's protected classes or, alternatively, IQVIA left the position open despite rejecting Ms. Goodson's application.

25.    IQVIA took adverse employment action against Ms. Goodson when it refused to provide her their exemption and accommodation process to apply for an exemption for the COVID-19 vaccination requirement due to its bias against those who were precluded from

receiving a COVID-19 vaccine due to their sincerely held religious beliefs and/or medical conflict with receipt of a COVID-19 vaccine.

26.    At this time, Defendant knew that COVID-19 vaccination was not a prerequisite for travel.

27.    At this time, Defendant had actual knowledge, through its own business records and through public heath guidance, that the COVID-19 vaccines did not prevent the transmission and infection of COVID-19.

28.    Because of this, Defendant pretextually refused to hire Ms. Goodson with actual knowledge that her vaccination status posed no greater health or safety threat to anyone than the threat posed by a vaccinated employee.

29.    Ms. Goodson could have performed her essential job duties exceptionally well, particularly given that she was qualified for the position and that she applied to a fully remote role.

30.    Defendant understood that a reasonable accommodation was possible, particularly, testing (potentially at the employee's expense) in conjunction with other enhanced safety protocols, in the unshown event that Ms. Goodson was required in the future to travel for her role and vaccination or testing became required.

31.    Ms. Goodson could have been accommodated without any hardship whatsoever, and in a manner that would have created a safer workplace than requiring vaccination alone.

32.    No reasonable accommodation was ever offered or discussed with Ms. Goodson, and worse, she was not even provided any form to submit an exemption request, despite her repeated requests regarding IQVIA's accommodation process.

33.    In fact, Ms. Goodson, despite her efforts, was never provided any information about the exemption process. She was informed by IQVIA personnel, in reckless disregard of applicable

legal requirements, that there were no exemptions for its COVID-19 vaccination requirement for this role.

34.    Any assertion that accommodating Ms. Goodson would cause Defendant undue hardship based on workplace safety rationales is pretextual and is otherwise based on hypotheticals and raw speculation.

35.    Defendant had actual knowledge that Ms. Goodson could have been hired and accommodated without any hardship whatsoever, and in a manner that would have created a safer workplace than requiring vaccination alone.

36.    Defendant could have hired and accommodated Ms. Goodson at no cost or purported risk to its workplace through simply observing the status quo of the position, fully remote work, or employing enhanced safety protocols that were already in place.

37.    Defendant, therefore, cannot show that it would have been a "substantial burden" or expense to have accommodated Ms. Goodson's religious beliefs. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (holding that, under Title VII, employers must accommodate their employee's religious beliefs short of "substantial burden" or expense when viewed in light of the particular businesses' capabilities to accommodate).

38.    Defendant violated Title VII (42 U.S.C. § 2000e-2 *et seq.*) by failing to engage in a good faith interactive process to determine if a reasonable accommodation existed for Ms. Goodson by failing to provide so much as a form for Ms. Goodson to request an exemption or even information about the exemption process.

39.    Defendant violated Title VII (42 U.S.C. § 2000e-2 *et seq.*) by failing to hire Ms. Goodson due to her membership in a protected class because Defendant rejected her application

after Ms. Goodson advised Defendant she had religious beliefs precluding receipt of a COVID-19 vaccine.

40.     Accordingly, Ms. Goodson seeks damages, including back pay, front pay, loss of salary increases, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, punitive damages, and reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which he is entitled.

## II.     PARTIES

41.     Plaintiff Lisa Goodson is currently a resident of Zionsville, Indiana.

42.     Defendant IQVIA was at all relevant times headquartered at 2400 Ellis Road, Durham, North Carolina, 27703, and has worldwide operations, including in this jurisdiction.

## III.     JURISDICTION AND VENUE

43.     This Court has original jurisdiction of this civil action, pursuant to 28 USC §1331, as one arising under the laws of the United States. *See* 28 USC §1331.

44.     This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq*.

45.     This Court has jurisdiction over Plaintiff Lisa Goodson, who at all relevant times hereto, resided in Zionsville, Indiana.

46.     This Court has jurisdiction over IQVIA, who was at all relevant times hereto, doing business in this district.

47.     Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within and were "committed" in this District and Ms. Goodson would have worked in this district had there been no Title VII violation. 42 U.S.C. § 2000e-5(f)(3).

## IV.    <u>FACTUAL ALLEGATIONS</u>

***Ms. Goodson's Application and IQVIA's Unlawful Rejection***

48.    Ms. Goodson applied for the position of Assistant Director of Patient Engagement Strategy, a fully remote role with IQVIA on March 7, 2023.

49.    Dustin Douglas ("**Mr. Douglas**") of IQVIA's HR team emailed Ms. Goodson the next day to set up an interview with her.

50.    On or about March 13, 2023, Ms. Goodson interviewed with Mr. Douglas. The interview went well, and Mr. Douglas invited Ms. Goodson to interview with Mr. Bosco, the hiring manager for the role that Ms. Goodson applied for.

51.    Ms. Magotra reached out to Ms. Goodson on March 30, 2023, to set up the formal interview with Mr. Bosco.

52.    On April 4, 2023, Ms. Goodson formally interviewed with Mr. Bosco.

53.    The interview went well, and Mr. Bosco invited Ms. Goodson to complete a sample analysis project so IQVIA could evaluate her work product while considering her for the position. Mr. Bosco sent an email to Ms. Goodson to provide her with the specifics of the project. This "Interview Work Study" required Ms. Goodson to propose a solution to a hypothetical problem and provide a presentation to IQVIA based on her recommendations.

54.    On April 4, 2023, following the interview, Ms. Goodson, for the first time noticed that the online job description for the position she applied for indicated it required a COVID-19 vaccination.

55.    On April 4, 2023, Ms. Goodson reached out to Ms. Magotra to inquire whether she would be required to receive a COVID-19 vaccination to be hired and inquired as to IQVIA's religious and medical accommodation policy.

56.     On April 5, 2023, Ms. Magotra responded via email that she would need to speak to Mr. Bosco as to the COVID-19 vaccination requirement.

57.     On April 6, 2023, Ms. Goodson also reached out to Mr. Bosco via email who advised Ms. Goodson that he was unsure of the COVID-19 vaccination requirement for her position as "vaccines are not required for travel," but that he would discuss with HR about IQVIA's corporate policy and provide this information to Ms. Goodson. Mr. Bosco stated, "I don't think there is anything in this role that would require it (e.g. going to HCP offices, etc.), but we do need to follow corporate policy."

58.     On April 18, 2023, when Ms. Goodson did not receive an immediate update from Ms. Magotra, she followed up with Mr. Bosco to inquire if the role required receipt of a COVID-19 vaccine so that she could, in accord with federal law, submit an exemption request to the COVID-19 vaccine requirement and continue with the next steps in the process.

59.     Mr. Bosco replied to advise that he was having a difficult time receiving concrete information on IQVIA's COVID-19 vaccination policy from his HR partner and whether it was a requirement for the position that Ms. Goodson applied for.

60.     On April 19, 2023, Ms. Goodson received a voicemail from "Anita" (last name unknown), who identified herself as Ms. Magotra's assistant. Anita advised Ms. Goodson that her position required receipt of a COVID-19 vaccine. Notably, Anita did not mention that IQVIA had any exemption process for this condition of employment.

61.     Ms. Goodson was told to cease work on the sample project she was given because she was no longer being considered for the position because she was not fully vaccinated for COVID-19.

62.    On April 20, 2023, confused by the lack of exemption process, Ms. Goodson again emailed Ms. Magotra and Mr. Bosco and requested them to provide details on their COVID-19 religious and medical accommodation process.

63.    After emails back and forth to try and get a firm answer from IQVIA on how to submit an exemption request to their COVID-19 vaccination requirement, Ms. Goodson received a phone call from Ms. Magotra. Ms. Magotra left Ms. Goodson a voicemail on May 1, 2023, that the COVID-19 vaccination policy had not changed, it would still be required for Ms. Goodson to be considered for the position.

64.    Ms. Goodson called Ms. Magotra back and left her a voicemail requesting information on the exemption process and advising that she would be requesting a religious and medical exemption to the COVID-19 vaccination requirement.

65.    On or about May 4, 2023, Ms. Magotra advised Ms. Goodson that it was up to Mr. Bosco whether she would be required to be vaccinated for COVID-19. Because Mr. Bosco was concerned that COVID-19 vaccination may, hypothetically, be required for travel in the future, he determined that Ms. Goodson had to be fully vaccinated for COVID-19. She further advised that Ms. Goodson would no longer be considered for the position she applied for because she wanted to apply for an exemption for religious/medical purposes to the COVID-19 vaccine requirement.

66.    Ms. Magotra further advised that this decision came directly from Mr. Bosco.

67.    Ms. Goodson continued to inquire about IQVIA's exemption process because a religious/medical exemption process is required under the law and mentioned again that she wanted to request a religious/medical exemption, but despite her many efforts, was never given any information about any exemption process. Instead, Ms. Goodson was advised that Mr. Bosco was requiring COVID-19 vaccination, period, for the position.

68.    Ms. Goodson was qualified for the position that she applied for.

69.    IQVIA rejected Ms. Goodson for the position she applied for because she advised IQVIA that she was going to request an accommodation to the COVID-19 vaccination requirement due to her medical/religious conflict with receipt of a COVID-19 vaccine.

70.    IQVIA never again reached out to provide Ms. Goodson any further information about the position.

71.    IQVIA filled the position with an applicant outside of Ms. Goodson's protected class.

72.    Alternatively, IQVIA left the position open after learning Ms. Goodson was going to assert her Title VII rights which they had no intention to honor due to religious bias.

***The Associate Director, Patient Engagement Strategy Remote Role***

73.    The position that Ms. Goodson applied for, Associate Director, Patient Engagement Strategy, is a fully remote role.[1]

74.    The job posting lists the position as "Remote" with the primary location of Ms. Goodson's office being in her home in Indiana.

75.    When Ms. Goodson asked Mr. Bosco about the COVID-19 vaccination requirement, Mr. Bosco advised Ms. Goodson "I don't think there is anything in this role that would require it [COVID-19 vaccination] (e.g., going to HCP offices, etc.), but we do need to follow corporate policy."

76.    On Ms. Goodson's final call with Ms. Magotra, Ms. Magotra admitted this was a fully remote position, but stated that there was potential, in the future, that a client of IQVIA may

---

[1] *See* Exhibit 1, Associate Director, Patient Engagement Strategy Job Posting.

require travel to their sites, and because of that, Mr. Bosco decided he must have a fully vaccinated employee in this position.

77.     Because of these admissions, any allegation that Ms. Goodson's role was not fully remote, or moreover, that she would have to be vaccinated to visit clients at some hypothetical point in the future, is pretext for discrimination.

78.     The real reason IQVIA cancelled Ms. Goodson's job application is because the company was motivated to avoid accommodating her religious beliefs in conflict with vaccination.

***Ms. Goodson's Religious Background and Religious Conflict with Receipt of a COVID-19 Vaccine***

79.     Ms. Goodson is a Christian and a member of True Hope Ministry led by Pastor David Hall and attends church services at Traders Point Christian Church in Zionsville, Indiana.

80.     Ms. Goodson's sincerely held religious beliefs preclude her from receipt of a COVID-19 vaccine. Ms. Goodson believes that the body is the temple of the Holy Spirit and that God created humans with a well-designed immune system. As a Christian, she objects to the intrusion of medical interventions that she deems are designed to modify God's perfect design of the immune system.

81.     Ms. Goodson believes it is an affront to her religious faith to inject the body with a man-made substance in an effort to "improve" the immune system because God has already created the body with natural immune mechanisms to ward off disease. In other words, Ms. Goodson, for religious reasons, does not preemptively tinker with the immune system God designed, believing that to do so shows a lack of faith in God.

82.     In addition, Ms. Goodson cannot use any product that takes its origin in abortion, the killing of human life, a proposition she finds support for in scripture. COVID-19 vaccines have ties to aborted fetal cell lines in their testing, manufacturing, and/or production. Ms. Goodson will

not knowingly participate in an act—here, receipt of a COVID-19 vaccine—that she believes violates the sanctity of human life and dishonors the lives of the unborn.

***Events Following Pretextual Termination of Job Application***

83.    After her job application was pretextually terminated on or about May 4, 2023, Ms. Goodson timely filed a Complaint of Discrimination with the Indiana Civil Rights Commission ("**ICRC**") on May 22, 2023. She advised that once she inquired about an exemption to Defendant's COVID-19 vaccination requirement, she was immediately rejected from employment with them due to Defendant's discriminatory policy to decline all exemption requests, in violation of Title VII of the Civil Rights Act of 1964.

84.    Ms. Goodson's charge of discrimination was dual filed with the Employment Opportunity Commission ("**EEOC**").

85.    The ICRC made a lack of probable cause finding.

86.    Ms. Goodson requested that the EEOC Conduct a substantial weight review of the ICRC's determination.

87.    On March 20, 2025, the EEOC issued Ms. Goodson her Notice of Right to Sue letter. [2]

## V.    <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
Religious Discrimination – Disparate Treatment/Failure to Hire**

88.    Ms. Goodson incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

---

[2] *See* Exhibit 2, March 20 and 21, 2025, Right to Sue Letters.

89.    Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).

90.    Title VII was designed to protect employees from the workplace effects of many of the same forms of discrimination that are forbidden by the Constitution — discrimination on the basis of race, color, religion, gender, and national origin."); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1117 (10th Cir. 2013) (recognizing reliance placed on First Amendment cases in defining religion for purposes of Title VII), *rev'd on other grounds.*

91.    The statute states that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" *Id.* The term "religion" as used within Title VII includes "all aspects of religious observance and practice, as well as belief."  *Id.*

92.    Title VII prohibits employers from discriminating against employees on the basis of religion. 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . .").

93.    "Religion" is defined to include all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C.S. § 2000e(j). Because this definition includes a requirement that

an employer "accommodate" an employee's religious expression, an employee is not limited to the disparate treatment theory to establish a discrimination claim.

94.     To establish a *prima facie* case for failure to hire under Title VII, a Plaintiff must present evidence that: "1) [s]he is a member of a protected class; 2) [s]he was qualified for an open position for which [s]he applied; 3) [her] application for employment was rejected; and 4) Defendant filled the position with someone not of [her] protected class or the position remained open." *Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005).

95.     "A plaintiff may satisfy [the prima facie burden] by presenting evidence 'that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Ames v. Ohio Dep't of Youth Servs.*, 221 L.Ed. 2d 929, 934 (U.S. 2025).

96.     If these elements are established, discrimination is inferred and the burden of production shifts to the Defendant to raise a legitimate, nondiscriminatory reason for the adverse employment action. *See Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 600 (7th Cir. 2010).

97.     If Defendant proffers a legitimate, nondiscriminatory reason for the rejection of employment, the burden shifts to the plaintiff to demonstrate that the proffered reason is pretext. *Id*.

98.     Plaintiff is a member of a protected class for two distinct reasons, which Defendant was aware of when deciding not to hire her. First, she is a Christian.  Second, her religious beliefs preclude her from receiving a COVID-19 vaccine and require accommodation. For the reasons detailed throughout, Ms. Goodson holds sincere religious beliefs that preclude her from receipt of a COVID-19 vaccine and informed Defendant of her intent to apply for a religious exemption.

99.     Ms. Goodson's beliefs are indeed sincere, as evidenced by her willingness to uphold her beliefs while knowing she would be rejected from the position she was qualified for, applied for, and interviewed for with Defendant.

100.    For the reasons articulated here and above, Ms. Goodson is a member of a protected class.

101.    Ms. Goodson was qualified for and applied for the position of Assistant Director of Patient Engagement Strategy, a fully remote role with Defendant on March 7, 2023.

102.    Ms. Goodson inquired about exemptions to Defendant's COVID-19 vaccine exemption policy and was immediately thereafter rejected from the position.

103.    Following her unlawful rejection, the position was left open on pretextual grounds or filled with a candidate outside of Ms. Goodson's protected class.

104.    Defendant did not engage in a good faith interactive process with Ms. Goodson to determine if it was possible to accommodate her sincere religious objections to receipt of a COVID-19 vaccine.

105.    In fact, Defendant never responded to provide Ms. Goodson with their COVID-19 corporate religious exemption or medical accommodation corporate policy. The defendant admitted they were not aware of any such corporate policy, told her the hiring manager required her to get the COVID-19 vaccination, and they failed to provide to her any actual, potential accommodation or exemption options for the fully remote position she applied for. These circumstances indicate discrimination.

106.    Defendant never offered Ms. Goodson the option to test regularly, even at her own expense, or any other potential accommodation in the unshown event she would have to travel to a client on behalf of Defendant.

107.     Ms. Goodson was informed that she was being denied the ability to continue the hiring process for a role she was well-qualified for and would have been offered. The denial was due to her membership in a protected class and need for accommodation. In other words, Defendant denied Ms. Goodson's application because it was motivated to avoid providing a religious accommodation, in reckless disregard of its Title VII obligations. Ms. Goodson was denied the ability to continue pursuing employment with Defendant under circumstances indicating discrimination.

108.     For the role that Ms. Goodson was interviewing for, Defendant maintained a per se unlawful "no accommodation" policy.

109.     If an applicant requires an accommodation from an employment policy in accord with her religious practices, it constitutes no defense that the subsequent failure to hire was due to an otherwise-neutral policy. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 776 (2015)

110.     Despite multiple efforts, Ms. Goodson was never advised on any exemption process or paperwork she could fill out to submit an exemption request to the Mandate.

111.     Ms. Goodson was rejected from the position due to her membership in a protected class.

112.     Any reasons given for the rejection of Ms. Goodson relating to her unvaccinated status are pretextual.

113.     Defendant had actual knowledge that the COVID-19 vaccines did not stop the transmission or infection of COVID-19, and therefore, Ms. Goodson was no greater a health or safety threat to anyone (particularly, since the role was fully remote) than a vaccinated employee.

114.    The Supreme Court's recent ruling in *Groff v. DeJoy* 600 U.S. 447, 470 (2023) makes clear that an "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*.

115.    When evaluating whether an accommodation would constitute an undue burden, employers must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* Thus, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.*

116.    Defendant is a large and sophisticated organization with considerable resources. Defendant has substantial resources and as such is able to accommodate its religious employees to a greater degree and with less burden than employers with fewer resources.

117.    Because there were multiple no-cost and low-cost accommodation options available, Defendant could have accommodated Ms. Goodson short of undue hardship.

118.    The most obvious accommodation option was allowing Ms. Goodson to work remotely, as the position was a fully remote position.

119.    Another accommodation option was regular testing in the unshown event travel was required, at an employee's expense, coupled with other safety protocols, which Ms. Goodson would have willingly incurred at her own expense.

120.    There were other low-cost and no-cost accommodation options Defendant refused to consider. In the event that Ms. Goodson was required to travel on-site to perform her job, she could have seamlessly performed her job through, inter alia: (1) providing regular proof of a negative COVID-19 test, which Ms. Goodson was willing to do at her own expense; (2) masking;

(3) recognizing the scientific reality of natural immunity against COVID-19 as an accommodation option and inquiring whether Ms. Goodson possessed antibodies to COVID-19 from prior infection; (4) observing other enhanced safety protocols where necessary, like social distancing, masking, and quarantining when symptomatic; or (5) any combination of the above.

121.    With any of these easily identifiable and low-cost, no-cost accommodation options, Ms. Goodson could have been accommodated with minimal or no burden to Defendant.

122.    Defendant refused to consider, much less provide, any of the above-referenced accommodations options for Ms. Goodson, and would not even give Ms. Goodson information on the exemption process.

123.    Instead, Defendant rejected Ms. Goodson from the interview process for choosing to uphold her religious convictions.

124.    These circumstances demonstrate unlawful discrimination, that Defendant was motivated to terminate Ms. Goodson's application due to her protected status.

125.    Because her sincere religious beliefs precluded Ms. Goodson from receiving one of the COVID-19 vaccines, and in light of the fact Defendant knew that the required vaccines were incapable of preventing infection and transmission but would violate Ms. Goodson's sincerely held religious beliefs, Defendant's actions were in reckless disregard of Ms. Goodson's rights under Title VII.

126.    As a result of Defendant's unlawful actions, Ms. Goodson has suffered emotional and psychological distress from the loss of employment opportunity, loss of promotional opportunities, loss of pension benefits, salary increases, and the career uncertainty generated by Defendant's actions and the repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career.

127.    As a result of the discriminatory treatment Ms. Goodson experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life, depression, feelings of despondency, social anxiety, trouble sleeping, complete loss of sleep, and feelings of agitation and irritability.

128.    As a result of Defendant's unlawful actions, Ms. Goodson has also suffered financial harm including loss of compensation, loss of benefits, loss of salary increases, loss and/or reduced coverage of health insurance, employee assistance program, short, and long-term disability insurance, company matched retirement, and accidental death insurance.

129.    Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Ms. Goodson's rights under Title VII.

130.    As a direct and proximate result of Defendant's discriminatory treatment, Ms. Goodson has suffered, and continues to suffer, economic, pecuniary damages for which she is entitled to judgment.

131.    The foregoing conduct constitutes illegal, and intentional failure to accommodate that is prohibited under 42 USC § 2000e-2 *et seq*.

132.    Ms. Goodson seeks back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

133.    As a direct and proximate result of the discriminatory treatment, Ms. Goodson has suffered, and continues to suffer, the damages hereinafter described. Accordingly, Ms. Goodson requests relief as hereinafter described.

## COUNT TWO

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
Religious Discrimination – Retaliation**

134.    Ms. Goodson incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

135.    Defendant retaliated against Ms. Goodson because she requested information on how to apply for an exemption to Defendant's COVID-19 vaccination requirement, which is protected activity.

136.    Ms. Goodson made Defendant aware that she was going to assert her Title VII rights and request an accommodation to Defendant's COVID-19 vaccination policy, which is protected activity.

137.    To establish a *prima facie* case for retaliation under Title VII, a Plaintiff must present evidence that: (1) [s]he engaged in statutorily protected activity; (2) [s]he suffered a materially adverse action; and (3) there is a but-for causal connection between the two events. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020).

138.    Ms. Goodson engaged in a statutorily protected activity when she requested Defendant to advise her on Defendant's COVID-19 vaccination accommodation process. Ms. Goodson made Defendant aware of her intention to file an accommodation request.

139.    Ms. Goodson suffered a materially adverse action when she was told that she would no longer be considered for the position after informed Defendant of her intent to apply for an accommodation to the COVID-19 vaccination requirement.

140.    Ms. Goodson would not have been removed for consideration for the role she interviewed for if she did not advise Defendant that she was going to seek an accommodation to the COVID-19 vaccination requirement. But for Ms. Goodson's clear communications that she

intended to exercise her Title VII rights and seek accommodation, she would not have been rejected from the position.

141.    If Defendant proffers a legitimate, nondiscriminatory reason for the rejection of employment, the burden shifts to the plaintiff to demonstrate that the proffered reason is pretext. *Id*.

142.    For the reasons detailed throughout, Ms. Goodson holds sincere religious beliefs that preclude her from receipt of a COVID-19 vaccine and informed Defendant of her intent to apply for a religious exemption.

143.    Ms. Goodson's beliefs are indeed sincere, as evidenced by her willingness to uphold her beliefs while knowing she would be rejected from the position she was qualified for, applied for, and interviewed for with Defendant.

144.    Ms. Goodson inquired about religious and medical exemptions to Defendant's COVID-19 vaccine exemption policy and was immediately thereafter rejected from the position without ever being informed of the accommodation policy or process.

145.    Defendant did not engage in a good faith interactive process with Ms. Goodson to determine if it was possible to accommodate her sincere religious objections to receipt of a COVID-19 vaccine.

146.    Defendant never offered Ms. Goodson the option to test regularly, even at her own expense, or any other potential accommodation in the unshown event she would have to travel to a client on behalf of Defendant.

147.    Despite multiple efforts, Ms. Goodson was never advised on any exemption process or paperwork she could fill out to submit a religious or medical exemption request to the Mandate.

148.    For these reasons, any justifications given for the rejection of Ms. Goodson relating to her unvaccinated status are pretextual.

149.    Defendant had actual knowledge that the COVID-19 vaccines did not stop the transmission or infection of COVID-19, and therefore, Ms. Goodson was no greater a health or safety threat to anyone (particularly, since the role was fully remote) than a vaccinated employee.

150.    The Supreme Court's recent ruling in *Groff v. DeJoy* 600 U.S. 447, 470 (2023) makes clear that an "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*.

151.    When evaluating whether an accommodation would constitute an undue burden, employers must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* Thus, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.*

152.    Defendant is a large and sophisticated organization with considerable resources. Defendant has substantial resources and as such is able to accommodate its religious employees to a greater degree and with less burden than employers with fewer resources.

153.    Because there were multiple no-cost and low-cost accommodation options available, Defendant could have accommodated Ms. Goodson short of undue hardship.

154.    The most obvious accommodation option was allowing Ms. Goodson to work remotely, as the position was a fully remote position.

155.     Another accommodation option was regular testing, at an employee's expense, coupled with other safety protocols, which Ms. Goodson would have willingly incurred at her own expense.

156.     There were other low-cost and no-cost accommodation options Defendant refused to consider. In the event that Ms. Goodson was required to travel on-site to perform her job, she could have seamlessly performed her job through, inter alia: (1) providing regular proof of a negative COVID-19 test, which Ms. Goodson was willing to do at her own expense; (2) masking; (3) recognizing the scientific reality of natural immunity against COVID-19 as an accommodation option and inquiring whether Ms. Goodson possessed antibodies to COVID-19 from prior infection; (4) observing other enhanced safety protocols where necessary, like social distancing, masking, and quarantining when symptomatic; or (5) any combination of the above.

157.     With any of these easily identifiable and low-cost, no-cost accommodation options, Ms. Goodson could have been accommodated with minimal or no burden to Defendant.

158.     Defendant refused to consider, much less provide, any of the above-referenced accommodations options for Ms. Goodson, and would not even give Ms. Goodson information on the exemption process.

159.     Instead, Defendant rejected Ms. Goodson from the interview process in retaliation for engaging in protected activity.

160.     Because her sincere religious beliefs precluded Ms. Goodson from receiving one of the COVID-19 vaccines, and in light of the fact Defendant knew that the required vaccines were incapable of preventing infection and transmission, but would violate Ms. Goodson's sincerely held religious beliefs, Defendants actions were in reckless disregard of Ms. Goodson's rights under Title VII.

161.    As a result of Defendant's unlawful actions, Ms. Goodson has suffered emotional and psychological distress from the loss of employment opportunity, loss of promotional opportunities, loss of pension benefits, salary increases, and the months of uncertainty and repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career.

162.    As a result of the discriminatory treatment Ms. Goodson experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life, depression, feelings of despondency, social anxiety, trouble sleeping, complete loss of sleep, and feelings of agitation and irritability.

163.    As a result of Defendants' unlawful and retaliatory actions, Ms. Goodson has also suffered financial harm including loss of compensation, loss of benefits, loss of salary increases, loss and/or reduced coverage of health insurance, employee assistance program, short, and long-term disability insurance, company matched retirement, and accidental death insurance.

164.    Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Ms. Goodson's rights under Title VII. As a direct and proximate result of Defendants' discriminatory and retaliatory treatment, Ms. Goodson has suffered, and continues to suffer, economic, pecuniary damages for which she is entitled to judgment.

165.    The foregoing conduct constitutes illegal, and intentional retaliation that is prohibited under 42 USC § 2000e-2 *et seq*.

166.    Ms. Goodson seeks back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

167.    As a direct and proximate result of the discriminatory treatment, Ms. Goodson has suffered, and continues to suffer, the damages hereinafter described. Accordingly, Ms. Goodson requests relief as hereinafter described.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself prays for judgment against Defendant, awarding relief as follows:

i.    Declare that Defendant violated Title VII by failing to hire Ms. Goodson due to her religious beliefs;

ii.    Declare that Defendant violated Title VII by failing to provide a reasonable accommodation to Ms. Goodson's sincerely held religious beliefs when numerous no-cost and low-cost options were available;

iii.    Declare that Defendant violated Title VII by taking adverse employment action against Ms. Goodson under circumstances that indicate religious discrimination;

iv.    Declare that Defendant violated Title VII by failing to engage in the interactive process by analyzing whether any accommodations existed that would not cause Defendant an undue burden in response to Ms. Goodson's request for accommodation to its Mandate, and instead, preemptively rejecting her application for pretextual reasons;

v.    Declare that Defendant retaliated against Ms. Goodson for engaging in protected activity;

vi.    Declare that Defendant recklessly disregarded Ms. Goodson's Title VII rights;

vii.    Require Defendant's supervisors and upper management to undergo training for Title VII regarding their duties to avoid discrimination on the basis of religion, consistent with Title VII's requirements;

viii.   Issue a permanent injunction requiring Defendant to expunge Ms. Goodson's personnel files, if any, of any derogatory, false, or misleading information relating to this matter; and prohibit the employer from defamation or discriminatory actions that would harm Ms. Goodson's ability to seek future employment with other companies.

ix.     Award Ms. Goodson damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages;

x.      Award Ms. Goodson damages necessary to make her whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial;

xi.     Award Ms. Goodson damages for severe emotional distress that resulted from Defendant's unlawful actions;

xii.    Award Ms. Goodson reasonable attorneys' fees and costs; and

xiii.   Grant any other relief that the Court deems just and proper;

## **VII. DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all counts so triable.

Dated: June 18, 2025

Respectfully submitted,

**SIRI | GLIMSTAD, LLP**

By: _/s/ William H. Payne, IV_
William H. Payne, IV
Jack R. Spitz*
8 Campus Drive,
Suite 105 PMB#161
Parsippany, NJ 07054
Phone: (717) 967-5529
Fax: 646-417-5967
wpayne@sirillp.com
jspitz@sirillp.com

_Attorneys for Plaintiff_

_* Pro Hac Vice request forthcoming_